VICTOR M. SHER (SBN 96197)
vic@sheredling.com
MATTHEW K. EDLING (SBN 250940)
matt@sheredling.com
STEPHANIE D. BIEHL (SBN 306777)
stephanie@sheredling.com
**SHER EDLING LLP**
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
Tel.: (628) 231-2500
Fax: (628) 231-2929

*Attorneys for Plaintiff East Bay Municipal Utility District*

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EAST BAY MUNICIPAL UTILITY DISTRICT, | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | (1) STRICT PRODUCTS LIABILITY (DESIGN DEFECT); |
| THE 3M COMPANY (F/K/A MINNESOTA MINING AND MANUFACTURING CO.), E. I. DU PONT DE NEMOURS AND COMPANY, THE CHEMOURS COMPANY, CHEMGUARD, INC., TYCO FIRE PRODUCTS LP, KIDDE-FENWAL, INC., KIDDE PLC, INC., CARRIER FIRE & SECURITY AMERICAS CORPORATION, INC., CARRIER GLOBAL CORPORATION, NATIONAL FOAM, INC., BUCKEYE FIRE EQUIPMENT COMPANY, ARKEMA, INC., BASF CORPORATION, CLARIANT CORPORATION, AGC CHEMICALS AMERICAS, INC., DYNAX CORPORATION, ARCHROMA U.S., INC., and DOES 1 through 100, | (2) STRICT PRODUCTS LIABILITY (FAILURE TO WARN); (3) NEGLIGENCE; (4) PUBLIC NUISANCE; (5) TRESPASS; (6) DECLARATORY RELIEF; **DEMAND FOR JURY TRIAL** |
| Defendants. | |

COMPLAINT

## TABLE OF CONTENTS

I.     INTRODUCTION ....................................................................................... 1

II.    PARTIES ..................................................................................................... 4

       A.  Plaintiff ............................................................................................ 4

       B.  Defendants ....................................................................................... 5

III.   JURISDICTION AND VENUE ............................................................... 10

IV.    FACTUAL ALLEGATIONS ..................................................................... 12

       A.  East Bay Municipal Utility District ............................................. 12

       B.  PFAS: Their Chemical Characteristics and Risks ..................... 14

       C.  Defendants' Production of PFAS Products ................................. 18

       D.  Defendants' Knowledge of Threats Posed by PFAS Products ................................. 19

       E.  Major Sources of PFAS in East Bay Municipal Utility District's Water Supply and
           Wastewater Stream. .................................................................... 25

       F.  East Bay Municipal Utility District Is Injured ......................... 27

V.     CAUSES OF ACTION ............................................................................. 28

       FIRST CAUSE OF ACTION  Strict Products Liability for Defective Design (Against
           All Defendants) ............................................................................ 28

       SECOND CAUSE OF ACTION  Strict Products Liability for Failure to Warn (Against
           All Defendants) ............................................................................ 30

       THIRD CAUSE OF ACTION  Negligence (Against All Defendants) ........................ 32

       FOURTH CAUSE OF ACTION  Public Nuisance (Against All Defendants) ............. 33

       FIFTH CAUSE OF ACTION  Trespass (Against All Defendants) .............................. 34

       SIXTH CAUSE OF ACTION  Declaratory Relief  (Against All Defendants) ............ 35

VI.    PRAYER FOR RELIEF ............................................................................ 36

# I.    INTRODUCTION

1.    Plaintiff East Bay Municipal Utility District ("EBMUD" "the District," or "Plaintiff") is a publicly owned utility that provides drinking water to 1.4 million customers and wastewater treatment services to 740,000 customers in Alameda County and Contra Costa County, California. EBMUD brings this action to recover the substantial costs necessary to protect the public and restore its drinking water supplies and wastewater stream from exposure to and contamination with toxic per- and poly-fluroalkyl substances ("PFAS"), including, but not limited to, perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonic acid ("PFOS"), perfluorobutanesulfonic acid ("PFBS"), and perfluorohexanesulfonic acid (PFHxS), from products made, marketed, or used by Defendants.

2.    Plaintiff brings this action to recover costs associated with the contamination of EBMUD's properties and water supplies with PFAS, and further seek abatement of the ongoing nuisance these chemicals constitute in the environment, and for such other action as is necessary to ensure that the PFAS that contaminates the tributaries and watershed supplying source drinking water for EBMUD do not present a risk to the public, including but not limited to equitable and declaratory relief. In this Complaint, references to specific PFAS (*e.g.*, PFOS and PFOA) are intended to include those compounds themselves—including all of their salts and ionic states, as well as the acid forms of the molecules, and their chemical precursors.

3.    PFAS are a class of chemicals colloquially known as "forever" chemicals because of their persistence and resistance to degradation. PFAS have impacted surface water in the vicinity of Plaintiff's water supplies, and now contaminates the water pumped from certain of Plaintiff's water supply reservoirs and are expected to contaminate Plaintiff's groundwater resources as well.

4.    PFAS are associated with a variety of illnesses, including cancer, and considered particularly dangerous to pregnant women and young children.

5.    Because of the risks that PFAS pose to human health, California's State Water Resources Control Board ("State Water Board") has preliminarily issued notification and response levels for PFAS in drinking water. In general, public water suppliers must report exceedances of notification levels to their immediate regulator, while their sampling data is reported to the State

Water Board, and the State Water Board recommends removing a drinking water source from service if it exceeds a response level. The State Water Board has established notification levels for PFOS and PFOA at 6.5 parts per trillion ("ppt") and 5.1 ppt respectively, and response levels for PFOS and PFOA at 40 ppt and 10 ppt respectively. It has also established a notification level for PFBS of 500 ppt and response level of 5,000 ppt and for PFHxS of 2 ppt for notification and 20 ppt for response. PFBS and PFHxS were used as a replacements for PFOS in consumer products when PFOS was phased out. California also appears poised to regulate other PFAS compounds, including: perfluorohexanoic acid (PFHxA); perfluoroheptanoic acid (PFHpA); perfluorononanoic acid (PFNA); perfluorodecanoic acid (PFDA); 4,8-dioxia-3H-perflourononanoic acid (ADONA). https://www.waterboards.ca.gov/drinking_water/certlic/drinkingwater/documents/pfos_and_pfoa/memo_nl_request_for_other_pfas.pdf (last accessed Feb. 17, 2023).

6.      California's Office of Environmental Health Hazard Assessment (OEHHA) has also published a proposed Public Health Goal for PFOS of 1ppt and PFOA of .007 ppt, which PHG is the first step in the State's effort to set a Maximum Contaminant Level ("MCL") for these compounds.      https://oehha.ca.gov/media/downloads/crnr/pfoapfosphgdraft061021.pdf      (last accessed Feb. 17, 2023).

7.      OEHHA has also found PFOS and its salts and transformation and degradation precursors to cause cancer and added it to the list of chemicals pursuant to Proposition 65.[1] https://oehha.ca.gov/proposition-65/crnr/meeting-synopsis-carcinogen-identification-committee-meeting-held-december-6 (last accessed Feb. 17, 2023). Perfluorononanoic acid ("PFNA") has also been added to the Proposition 65 list following a finding by OEHHA that it causes reproductive      toxicity.      https://oehha.ca.gov/proposition-65/crnr/notice-interested-parties-chemicals-listed-effective-december-31-2021-known      (last accessed Feb. 17, 2023); *see*, https://oehha.ca.gov/media/downloads/proposition-65//p65chemicalslistsinglelisttable2021p.pdf (last accessed Feb. 17, 2023).

---

[1] Long title: The Safe Drinking Water and Toxics Enforcement Act of 1986, codified at Health and Safety Code section 25249.5 et seq.

8.    The California State Water Board and other state agencies are preparing further regulatory actions on PFAS. Similarly, the U.S. Environmental Protection Agency ("EPA") is preparing further regulatory actions on PFAS under a range of federal laws, and the levels at which these regulators are poised to regulate PFOA, PFOS, and other PFAS are significantly lower than the current California response and notification limits.

9.    Defendants—3M Company ("3M"); E.I. DuPont de Nemours and Company ("DuPont"); and The Chemours Company ("Chemours"); Chemguard, Inc. ("Chemguard"); Tyco Fire Products LP ("Tyco"); Kidde-Fenwal, Inc. ("Kidde"); Kidde PLC, Inc. ("Kidde PLC"); Carrier Fire & Security Americas Corporation ("Carrier Fire"); Carrier Global Corporation ("Carrier"); National Foam, Inc. ("National Foam"); Buckeye Fire Equipment Company ("Buckeye"); Arkema, Inc. ("Arkema"); BASF Corporation ("BASF"); Clariant Corporation ("Clariant"); AGC Chemicals Americas, Inc. ("AGC Americas"); Dynax Corporation ("Dynax"); Archroma U.S., Inc.   ("Archroma U.S."); and DOE Defendants 1-100 (collectively, "Defendants")—are major chemical companies that designed, manufactured, marketed, promoted, sold, supplied, distributed, used, and/or disposed of PFAS, products containing PFAS, and/or products that degrade into PFAS after release to the environment (collectively, "PFAS Products") that currently impact EBMUD's water supplies and wastewater effluent. Defendants made products with PFAS, including but not limited to Teflon®, Scotchguard®, waterproofing compounds, stain-proofing compounds, waxes, paper and cloth coatings, aqueous film-forming foam ("AFFF"), a firefighting agent used to control and extinguish Class B fuel fires, and fluorosurfactants used in the manufacture of AFFF as well as telomer building blocks used to make fluorosurfactants that were then used to manufacture other PFAS-containing products, including AFFF.

10.    Defendants knew or should have known that PFAS are highly soluble in water; extremely mobile; persistent; very likely to contaminate surface and groundwater, including drinking supplies; and present significant risks to human health and welfare if released to the environment. Nonetheless, Defendants manufactured, marketed, distributed, sold, and/or

promoted PFAS Products that either contained or would degrade to PFAS that currently impact EBMUD's water supply and wastewater stream.

11.     The Defendants not only failed to warn of these risks and harms relating to PFAS, but also concealed the dangers of PFAS Products from consumers, the public, and the State. Defendants' own research showed that the normal use and disposal of PFAS Products would contaminate the environment and endanger public health. But Defendants denied, downplayed, and distorted these risks.

12.     By marketing, promoting, selling, supplying, distributing, using, and/or disposing PFAS Products in California and in the vicinity of EBMUD's water supply, the Defendants caused contamination of EBMUD's water supply and wastewater stream.

13.     Plaintiff files this lawsuit to seek abatement of an ongoing nuisance, to recover compensatory and all other damages and relief, including all necessary funds to compensate Plaintiff for the costs of investigating and remediating the contamination of surface water, groundwater, and wastewater effluent impacted by PFAS, designing, constructing, installing, operating, and maintaining the treatment facilities and equipment required to remove PFAS from public water supplies, and for such other damages and relief the Court may order.

## II.     PARTIES

### A.     Plaintiff

14.     Plaintiff East Bay Municipal Utility District is a publicly owned utility formed under the Municipal District Act Passed by the California legislature in 1921. Plaintiff owns and operates a water supply and transmission system consisting of reservoirs, aqueducts, treatment plants and distribution facilities, which begins in the Mokelumne River Watershed in the Sierra Nevada and extends 90 miles into Alameda and Contra Costa Counties. EBMUD also serves as a Groundwater Sustainability Agency for the East Bay Plain Subbasin of the Santa Clara Valley Basin. EBMUD also operates a wastewater treatment system which serves approximately 740,000 customers and includes three facilities that handle wet weather flows, and a Main Wastewater Treatment Plant. EBMUD's headquarters are located at 375 11th Street, Oakland, California.

///

**B.    Defendants**

15.    **Defendant 3M Company** ("3M") is a Delaware corporation with its principal place of business in St. Paul, Minnesota. 3M has manufactured, marketed, promoted, distributed, and/or sold PFAS Products throughout the United States, including in California. For instance, 3M has operated and continues to operate four manufacturing plants in California, at least three of which have manufactured PFAS Products: 3M's Monrovia Oral Care Facility manufactures dental products, including some that have contained PFAS; 3M's Corona Plant manufactures, inter alia, roofing granules that have contained PFAS; and 3M's Tape Facility currently manufactures tape and other adhesives that have at times contained PFAS, and over the years of its operations may have also coated fabrics with PFAS chemicals and manufactured other fluorochemical products. 3M has marketed and sold its PFAS Products, including those manufactured at its California plants, in California, with the specific intent to avail itself of the California market; and end users have used and disposed of such products in California in a manner in which led to releases of 3M's PFAS to the environment that have impacted EBMUD's water supply.

16.    **Defendant E.I. Du Pont De Nemours and Company** ("DuPont") is an American conglomerated chemical company, incorporated in the state of Delaware and with its principal place of business in Wilmington, Delaware. As a large chemicals manufacturer, DuPont manufactured, marketed, promoted, distributed, and/or sold PFAS Products throughout the United States, including in California and in the vicinity of EBMUD's reservoirs.[2] DuPont has done business throughout the United States, including conducting business in California, and is registered to do business in California. DuPont has employed workers in California, conducted research relating to its PFAS Products in California (including working with university researchers and academics), and contracted with distributors for the purpose of distributing PFAS Products to California.

17.    **Defendant The Chemours Company** ("Chemours") is a corporation duly organized under the laws of the state of Delaware, with its principal place of business located at

---

[2] EBMUD reserves the right to join Corteva, Inc. ("Corteva") and/or DuPont de Nemours, Inc. ("New DuPont"), each Delaware corporations with their principal place of business in Wilmington, Delaware, to this complaint. Corteva and New DuPont may hold certain relevant assets and liabilities of DuPont.

1007 Market Street, Wilmington, Delaware 19899. Chemours was a wholly owned subsidiary of DuPont. In July 2015, DuPont completed its spin-off of Chemours as a separate, publicly traded entity. In connection with the spin-off, Chemours took control of DuPont's performance chemicals business line, including its fluoroproducts business (including PFAS Products). In this transaction, Chemours assumed all or part of DuPont's liabilities relating to PFAS Products. Chemours does business throughout the United States, including conducting business in California, and is registered to do business in California. Defendants DuPont and Chemours are collectively referred to herein as the "DuPont Defendants."

18.     **Defendant Chemguard, Inc.** ("Chemguard") is a Texas corporation with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. Chemguard is a subsidiary of Johnson Controls International plc. At all relevant times, Chemguard conducted business throughout the United States, including in California. Chemguard manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS and that was transported, stored, used, handled, trained with, used to test equipment with, released, spilled, otherwise discharged, and/or disposed in California.

19.     **Defendant Tyco Fire Products LP** ("Tyco") is a Delaware limited partnership with its principal place of business located at One Tyco Park, Exeter, New Hampshire 03833. Tyco acquired Chemguard in 2011. Tyco is registered to do business in California. Tyco is the successor-in-interest to The Ansul Company ("Ansul"). Tyco is an indirect subsidiary that is ultimately owned wholly by Johnson Controls International plc, an Irish public limited company listed on the New York Stock Exchange. This Complaint collectively refers to Tyco and Ansul as "Tyco/Ansul." At all relevant times, Tyco/Ansul conducted business throughout the United States, including in California. Tyco/Ansul has designed, manufactured, marketed, and sold AFFF containing PFAS and/or its precursors that was transported, stored, used, handled, trained with, used to test equipment with, released, spilled, otherwise discharged, and/or disposed in California.

20.     **Defendant Kidde-Fenwal, Inc.** ("Kidde") is a Delaware corporation with its principal place of business located at 400 Main Street, Ashland, Massachusetts 01721. Kidde is registered to do business in California. Kidde was part of UTC Fire & Security Americas

Corporation, Inc. Kidde is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc., f/k/a National Foam System, Inc.) (collectively, "Kidde Fire"). At all relevant times, Kidde Fire conducted business throughout the United States, including in California. Kidde Fire has designed, manufactured, marketed, and sold AFFF containing PFAS and/or its precursors that was transported, stored, used, handled, trained with, used to test equipment with, released, spilled, otherwise discharged, and/or disposed in California.

21.     **Defendant Kidde PLC, Inc.** ("Kidde PLC") is a Delaware corporation with its principal place of business located at 9 Farm Springs Road, Farmington, Connecticut 06032. Kidde PLC, Inc. was part of UTC Fire & Security Americas Corporation, Inc. At all relevant times, Kidde PLC, Inc. conducted business throughout the United States, including in California. Kidde PLC manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS throughout the United States, including in California.

22.     **Defendant Carrier Fire & Security Americas Corporation, Inc.** ("Carrier Fire") is a Delaware corporation with its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418, and is registered to do business in California. Carrier Fire is successor to UTC Fire & Security Americas Corporation, Inc. ("UTC"), which was a division of United Technologies Corporation. UTC manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS throughout the United States, including in California. A current or former affiliated company of UTC and Carrier Fire is Chubb Fire, LTD, a foreign private limited company, United Kingdom registration number 134210, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ.

23.     **Defendant Carrier Global Corporation** ("Carrier") is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Carrier Fire & Security Americas Corporation is registered to do business in California under the same address as Carrier. On or around April 3, 2020, UTC completed the spin-off of one of its reportable segments into Carrier, a separate publicly traded company. Carrier's operations are classified into three segments: HVAC, Refrigeration, and Fire & Security. At all relevant times, Carrier conducted business throughout the United States, including in

California. Carrier's Fire & Security products and services are sold under brand names including Chubb and Kidde. Carrier manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS throughout the United States, including in California.

24.     **Defendant National Foam, Inc.** ("National Foam") is a Delaware corporation with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501. National Foam is a subsidiary of Angus International Safety Group, Ltd. National Foam manufactures the Angus brand of AFFF products. National Foam has designed, manufactured, marketed, and sold AFFF containing PFAS and/or its precursors that was transported, stored, used, handled, trained with, used to test equipment with, released, spilled, otherwise discharged, and/or disposed in California.

25.     **Defendant Buckeye Fire Equipment Company** ("Buckeye") is an Ohio corporation with its principal place of business at 110 Kings Road, Mountain, North Carolina 28086. Buckeye is registered to do business in California. At all relevant times, Buckeye conducted business throughout the United States, including California. Buckeye has designed, manufactured, marketed, and sold AFFF containing PFAS and/or its precursors that was transported, stored, used, handled, trained with, used to test equipment with, released, spilled, otherwise discharged, and/or disposed in California.

26.     **Defendant Arkema, Inc.** ("Arkema") is a Pennsylvania corporation with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406. Arkema is registered to do business in California. Arkema has designed, manufactured, marketed, and sold AFFF containing PFAS and/or its precursors that was transported, stored, used, handled, trained with, used to test equipment with, released, spilled, otherwise discharged, and/or disposed in California.

27.     **Defendant BASF Corporation** ("BASF") is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. BASF is the successor-in-interest of Ciba Holding, Inc., Ciba Corporation, Ciba Specialty Chemicals, and Ciba Geigy Corporation (collectively "Ciba"). BASF is registered to do business in California. Ciba and

1    BASF manufactured, marketed, promoted, distributed, and/or sold PFAS Products throughout the

2    United States, including in California.

3         28.    **Defendant Clariant Corporation** ("Clariant") is a New York corporation with its

4    principal place of business located at 500 E. Morehead Street, Suite 400, Charlotte, North Carolina

5    28202. Clariant is a subsidiary of Clariant Ltd, a Swiss company with headquarters in Muttenz,

6    Switzerland, and with subsidiaries throughout the United States. Clariant was formed in 1995, via

7    a name change from Sandoz Chemical Corporation, and in 1997, it acquired AFFF-related assets

8    of Hoechst Specialty Chemicals. This Defendant manufactured PFAS Products for use in AFFF.

9    Clariant is registered to do business in California. Clariant has designed, manufactured, marketed,

10   and sold fluorosurfactants containing PFOA and/or its precursors used to manufacture AFFF that

11   was transported, stored, used, handled, trained with, used to test equipment with, released, spilled,

12   otherwise discharged, and/or disposed in California.

13        29.    **Defendant AGC Chemicals Americas, Inc.** ("AGC Americas") is a Delaware

14   corporation with its principal place of business at 55 E. Uwchlan Avenue, Suite 201, Exton,

15   Pennsylvania 19341. AGC Americas is a wholly owned U.S. subsidiary of AGC, Inc., a Japanese

16   corporation formerly known as Asahi Glass Company, Ltd. AGC Americas is registered to do

17   business in California. AGC Americas and/or its affiliates have designed, manufactured, marketed,

18   and sold fluorosurfactants containing PFOA, and/or their precursors used to manufacture AFFF,

19   that was transported, stored, handled, used, trained with, used to test equipment with, released,

20   spilled, otherwise discharged, and/or disposed in California.

21        30.    **Defendant Dynax Corporation** ("Dynax") is a Delaware corporation with its

22   principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523. This

23   Defendant manufactured PFAS Products for use in AFFF. At all relevant times, Dynax conducted

24   business throughout the United States, including California. Since its founding in 1991, Dynax has

25   been a leading producer of specialized fluorochemicals and a primary fluorosurfactant provider

26   for at least 3M and National Foam within the relevant time period. The fluorosurfactant provided

27   by Dynax is used to make AFFF. Dynax has designed, manufactured, marketed, and sold

28   fluorosurfactants containing PFOA, and/or its precursors used to manufacture AFFF, that was

transported, stored, used, handled, trained with, used to test equipment with, released, spilled, otherwise discharged, and/or disposed in California.

31. **Defendant Archroma U.S., Inc.** ("Archroma U.S.") is a Delaware corporation with its principal place of business located at 5435 77 Center Drive, #10, Charlotte, North Carolina 28217. Archroma U.S. is registered to do business in California. Archroma U.S. is a successor to Clariant Corporation, which manufactured fluorochemicals used in AFFF and was formerly known as Sandoz Chemicals Corporation and as Sodeyeco, Inc. Archroma U.S. is a wholly owned U.S. subsidiary of Archroma Management, LLC (which is a foreign limited liability company registered in Switzerland), and supplied PFAS Products for use in AFFF. Archroma U.S. has designed, manufactured, marketed, and sold fluorosurfactants containing PFOA, and/or its precursors used to manufacture AFFF, that was transported, stored, handled, used, trained with, used to test equipment with, released, spilled, otherwise discharged, and/or disposed in California.

32. At all relevant times, the true names or capacities, whether individual, corporate, otherwise, of DOE Defendants 1 through 100, inclusive, remain unknown to Plaintiff and, therefore Plaintiff sues said Defendants by such fictitious names. Plaintiff is informed and believes, and based thereon alleges that, each of the Defendants designated herein by fictitious names is in some manner legally responsible for the events and happenings herein referred to and caused the damages proximately and foreseeably to Plaintiff as alleged herein.

33. At all relevant times, all of said Defendants herein, including the named Defendants, and DOE Defendants 1 through 100, inclusive, are collectively referred herein as "Defendants," and all acts and omissions of said Defendants were undertaken by each of the Defendants and said Defendants' agents, servants, employees, and/or owners, acting in the course and scope of its respective agencies, services, employments, and/or ownerships.

## III.    JURISDICTION AND VENUE

34. The United States District Court for the Northern District of California has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy is between citizens of different states and exceeds the sum of $75,000.

35.     This Court has personal jurisdiction over Defendants because each Defendant has sufficient minimum contacts in California or otherwise intentionally avails itself of the California market through the distribution and/or sale of PFAS Products in the State of California so as to render the exercise of jurisdiction over it by this Court consistent with traditional notions of fair play and substantial justice.

36.     At all relevant times, each Defendant engaged in or was authorized to do business in the state of California.

37.     At all relevant times, the Defendants have engaged in substantial, continuous economic activity in California, including the business of researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise being responsible for PFAS Products, and that said activity by the Defendants is substantially connected to the Plaintiff's claims as alleged herein.

38.     The Defendants purposefully affiliated themselves with the forum of the state of California giving rise to the underlying controversy. Such purposeful availment and activities within and related to the state of California include, but are not limited to, 1) the Defendants' contractual relationships with entities giving rise to researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise being responsible for PFAS Products, which was substantially connected to the Plaintiff's claims as alleged herein; 2) agreements between the Defendants and entities, institutions, and academics within state of California regarding PFAS and PFAS Products where the Defendants contractually consented to have state courts within the state of California adjudicate disputes; 3) marketing and advertising of certain PFAS Products by the Defendants targeted specifically to Plaintiff within the state of California; 4) lobbying, consulting, and advisory efforts on behalf of the Defendants with regard to PFAS Products stemming from law firms and other agents in the state of California; and 5) other actions by Defendants targeted to the state of California to be obtained through discovery and other means. As the location from which the Defendants' suit-related conduct arose, California has a substantial vested interest in the acts of the Defendants which led to the underlying controversy.

COMPLAINT                                                                                    11

39.     At all times herein mentioned, each Defendant had actual knowledge that each of the other Defendants was going to intentionally and negligently engage in the tortious misconduct and acts alleged in the causes of action set forth in this complaint, including but not limited to the acts, failures to act, misrepresentations and breaches of duties of care owed by each of the Defendants.

40.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. sections 1391(b) and 1402, because the acts and omissions giving rise to this claim occurred in the bay area of San Francisco, California.

## IV.     FACTUAL ALLEGATIONS

### A.     East Bay Municipal Utility District

41.     EBMUD meets its customers' demands for water primarily with surface water supplied by an extensive system of reservoirs, aqueducts, pumping plants, and treatment facilities but also has rights to draw from certain groundwater resources, and has responsibility to sustainably manage the East Bay Plain Subbasin.

42.     EBMUD holds a property interest in its surface water and groundwater rights that is recognized under the law of the state of California. EBMUD's water right is usufructuary, entitling EBMUD to appropriate and use surface water from the Mokelumne River watershed and other groundwater to supply its customers with drinking water.

43.     EBMUD owns its drinking water and wastewater infrastructure.

44.     EBMUD has the right to draw up to 325 million gallons daily from the Mokelumne River watershed where it maintains two reservoirs in the Sierra Nevada foothills. This water is then transmitted through a system of aqueducts over 90 miles to Alameda and Contra Costa Counties where it is treated and distributed or held in three reservoirs before treatment and distribution to EBMUD's approximately 1.4 million drinking water customers. EBMUD's service area is over 332-square miles extending from Crockett on the north, southward to San Lorenzo

and portions of Hayward (encompassing the major cities of Oakland and Berkeley), eastward from San Francisco to Walnut Creek, and south through the San Ramon Valley, as depicted below.



45.    EBMUD provides wastewater treatment for over 740,000 residents along the eastern shore of the San Francisco Bay. Wastewater collected from homes and businesses is carried through sewers and interceptors to EBMUD's wastewater treatment plant in Oakland. The plant treats sewage to meet stringent state and federal standards before it is recycled or discharged into the San Francisco Bay. PFAS in the EBMUD's water supply and in EBMUD's wastewater comes from Defendants' PFAS Products that were used, disposed, or otherwise released in the households, businesses, or industries that discharge wastewater to the EBMUD system.

46.    EBMUD's water resources are also contaminated by Defendants' PFAS Products that were used and disposed of or otherwise released in the areas from which EBMUD sources its water supplies.

47.    The East Bay Plain Subbasin, which EBMUD has responsibility for sustainably managing has also been contaminated by PFAS, which investigation remains ongoing. https://www.hayward-ca.gov/sites/default/files/EBP%20GSP%20Chap2%20PUBLIC%20REVIEW%20DRAFT_0916 21.pdf at 33–34 (last accessed Feb. 17, 2023).

48.    PFAS has been detected in EBMUD's Bay Area reservoirs in concentrations exceeding interim federal health advisory levels as well as California's Public Health Goals. EBMUD's water supply has been, is, and will continue to be impacted by PFAS, including, but not limited to, PFOA, PFOS, PFBS, PFHpA, PFHxS, PFDA, PFNA, and PFHxA.

49.    PFAS has been detected in EBMUD's wastewater influent, effluent, and biosolids. EBMUD's operations and beneficial use of its products are, and will continue to be impacted by PFAS, including, but not limited to, PFOA, PFOS, PFBA, PFHpA, PFHxS, PFDA, PFNA, PFHxA, and PFPeA.

**B.    PFAS: Their Chemical Characteristics and Risks**

50.    PFAS are a family of chemical compounds containing fluorine and carbon atoms.

51.    For purposes of this Complaint, PFAS includes, but is not limited to, the following list of substances (including the chemicals themselves, as well as all of their salts, ionic states, acid forms of molecules, and "precursor" chemicals):

a.    Perfluorooctanoic acid (PFOA) (Fluorinated Carbon Chain Length: C8) (Chemical Abstract Services Registry Number (CASRN): 335-67-1);

b.    Perfluorooctanesulfonic acid (PFOS) (Fluorinated Carbon Chain Length: C8) (CASRN: 1763-23-1);

c.    Perfluorononanoic acid (PFNA) (Fluorinated Carbon Chain Length: C9) (CASRN: 375-95-1);

d.    Perfluorohexanoic acid (PFHxA) (Fluorinated Carbon Chain Length: C6) (CASRN: 307-24-4);

e.    Perfluorohexanesulfonic acid (PFHxS) (Fluorinated Carbon Chain Length: C6) (CASRN: 355-46-4);

f.    Perfluorobutanesulfonic acid (PFBS) (Fluorinated Carbon Chain Length: C4) (CASRN: 375-73-5);

g.    Hexafluoropropylene oxide dimer acid (HFPO-DA or GenX) (Fluorinated Carbon Chain Length: C6) (CASRN: 13252-13-6a);

h.  Perfluorotetradecanoic acid (PFTeA) (Fluorinated Carbon Chain Length: C14) (CASRN: 376-06-7);

i.  Perfluorotridecanoic acid (PFTriA) (Fluorinated Carbon Chain Length: C13) (CASRN: 72629-94-8);

j.  Perfluorododecanoic acid (PFDoA) (Fluorinated Carbon Chain Length: C12) (CASRN: 307-55-1);

k.  Perfluoroundecanoic acid (PFUnA) (Fluorinated Carbon Chain Length: C11) (CASRN: 2058-94-8);

l.  Perfluorodecanoic acid (PFDA) (Fluorinated Carbon Chain Length: C10) (CASRN: 335-76-2);

m.  Perfluoroheptanoic acid (PFHpA) (Fluorinated Carbon Chain Length: C7) (CASRN: 375-85-9);

n.  Perfluoropentanoic acid (PFPeA) (Fluorinated Carbon Chain Length: C5) (CASRN: 2706-90-3);

o.  Perfluorobutanoic acid (PFBA) (Fluorinated Carbon Chain Length: C4) (CASRN: 375-22-4);

p.  Perfluorodecanesulfonic acid (PFDS) (Fluorinated Carbon Chain Length: C10) (CASRN: 335-77-3);

q.  Perfluorononanesulfonic acid (PFNS) (Fluorinated Carbon Chain Length: C9) (CASRN: 68259-12-1);

r.  Perfluoroheptanesulfonic acid (PFHpS) (Fluorinated Carbon Chain Length: C7) (CASRN: 375-92-8);

s.  Perfluoropentanesulfonic acid (PFPeS) (Fluorinated Carbon Chain Length: C5) (CASRN: 2706-91-4);

t.  Perfluorooctanesulfonamide (PFOSA) (Fluorinated Carbon Chain Length: C8) (CASRN: 754-91-6);

u.  Fluorotelomer sulphonic acid 8:2 (FtS 8:2) (Fluorinated Carbon Chain Length: C8) (CASRN: 39108-34-4);

v. Fluorotelomer sulphonic acid 6:2 (FtS 6:2) (Fluorinated Carbon Chain Length: C6) (CASRN: 27619-97-2);

w. Fluorotelomer sulphonic acid 4:2 (FtS 4:2) (Fluorinated Carbon Chain Length: C4) (CASRN: 757124-72-4);

x. 2-(N-Ethylperfluorooctanesulfonamido) acetic acid (N-EtFOSAA) (Fluorinated Carbon Chain Length: C8) (CASRN: 2991-50-6);

y. N-Ethyl Perfluorooctane sulfamide (N-EtFOSA) (CASRN: 4151-50-2);

z. N-Ethyl Perfluorooctane sulfonamidoethanol (N-EtFOSE) (CASRN: 1691-99-2);

aa. Perfluorooctandecanoic acid (PFODA) (CASRN: 16517-11-6);

bb. 4,8-Dioxa-3H-perfluorononanoic acid (DONA) (CASRN: 958445-44-8);

cc. 2-(N-Methylperfluorooctanesulfonamido) acetic acid (N-MeFOSAA) (Fluorinated Carbon Chain Length: C8) (CASRN: 2355-31-9);

dd. 11-chloroeicosafluoro-3-oxaundecane-1-sulfonic acid (11Cl-PF3OUdS) (Fluorinated Carbon Chain Length: C10) (CASRN: 763051-92-9b);

ee. 9-chlorohexadecafluoro-3-oxanone-1-sulfonic acid (9Cl-PF3ONS) (Fluorinated Carbon Chain Length: C8) (CASRN: 756426-58-1c);

ff. 4,8-dioxa-3H-perfluorononanoic acid (ADONA) (Fluorinated Carbon Chain Length: C7) (CASRN: 919005-14-4d).

52.     There are more than 9,000 different types of PFAS. The list contained in the above paragraph is not a complete list of PFAS that are the subject of this Complaint. The Complaint encompasses all of the thousands of PFAS, known or unknown. EBMUD reserves its right to identify additional PFAS through discovery and as the science and research on PFAS develops.

53.     PFAS have been used for decades to produce household and commercial products that are heat resistant, stain resistant, long lasting, and water- and oil-repellant. PFAS have been incorporated into products such as dental floss, furniture and carpet coatings, food wrappers, household and commercial pesticides, nonstick pans, clothing, and others. The PFAS family of chemicals is entirely manmade and does not occur in nature. PFOA and PFOS have been the most widely studied compounds in this family.

54.     PFAS have characteristics that cause extensive and persistent environmental contamination. Specifically, they are (1) mobile—that is, because they are highly soluble, they are readily transported through soil, airborne particulate matter, surface water and groundwater where they can migrate long distances; and (2) persistent—that is, they do not readily biodegrade or chemically degrade in the environment or in conventional treatment systems. In short, once PFAS are applied, discharged, disposed of, or otherwise released onto land or into water, those compounds migrate through the environment and into groundwater and surface water, resist natural degradation, and are difficult and costly to remove.

55.     PFAS bioaccumulate and biomagnify in people and other organisms.

56.     Scientists link PFAS with a wide range of serious public health impacts, including kidney and testicular cancer, thyroid disease, ulcerative colitis, high cholesterol, pregnancy induced hypertension, and low birth weight.

57.     PFAS contamination of drinking water presents a serious threat to public health.

58.     In addition to drinking contaminated water, humans can be exposed to PFAS through inhalation, ingestion of contaminated food, and dermal contact.

59.     PFAS enter the environment from industrial facilities that use PFAS in the manufacture or production of other products. Releases to land, air, and water from industrial sites are known pathways to the environment.

60.     PFAS may also enter the environment when released from PFAS-containing consumer and commercial products during their use, and after they have been disposed to landfills or in any other manner.

61.     AFFF is also a source of PFAS contamination. Firefighters apply AFFF by spraying the foam solution directly onto the fire, where it can then freely seep into surrounding soil and groundwater, and runoff into surface water. PFAS-containing AFFF has routinely been used in thousands of fire training exercises at military installations, civilian airports, local fire departments, and industrial facilities throughout the United States. A single firefighting training event can discharge thousands of gallons of PFAS-containing AFFF foam solution into the natural environment.

62.     The Defendants have known of health and environmental risks associated with PFAS compounds for decades but concealed that knowledge until it was exposed through litigation and regulatory action in relatively recent years.

63.     The Defendants' manufacture, distribution and/or sale of PFAS and/or products containing PFAS resulted in the release of PFAS into the environment.

64.     Through their involvement and/or participation in the creation of consumer or other commercial products and materials and related training and instructional materials and activities, the Defendants knew, foresaw, and/or should have known and/or foreseen that their PFAS Products would contaminate the environment.

65.     The Defendants knew, foresaw, and/or should have known and/or foreseen that their marketing, promotion, development, manufacture, distribution, release, training of users of, production of instructional materials about, sale and/or use of PFAS Products, including in California, would result in the contamination of the surface water that is the primary source of water supply for Plaintiff's public water system.

66.     The Defendants' products were unreasonably and inherently dangerous and the Defendants failed to warn of this danger.

C.     Defendants' Production of PFAS Products

67.     PFAS were first developed in the late 1930s to 1940s and put into large-scale manufacture and use by the early 1950s.

68.     For most of the past several decades, 3M has been the primary manufacturer of PFAS in the United States. Beginning in the 1940s, 3M produced PFAS by electrochemical fluorination. This process results in a product that contains or breaks down into compounds containing PFOS, PFOA, PFNA, and/or PFHxS. 3M went on to market several PFOA and PFOS products, including its Scotchgard brand of stain repellant, food packaging, textile treatments, and fluorosurfactants and additives, among many others.

69.     From the 1940s through the early 2000s, 3M was the primary manufacturer of PFAS in the United States. 3M was the only known domestic manufacturer of PFOS and PFHxS.

3M was also a major manufacturer of PFOA; the sole domestic manufacturer of PFOA until it left the market.

70.    3M manufactured PFAS as raw chemical materials for use in 3M products and products made by third parties. 3M marketed and sold PFAS Products, throughout the United States and California, including in the East Bay area.

71.    In response to pressure from the EPA, 3M began phasing out production of its long-chain PFAS Products in the early 2000s.

72.    In or around 1951, DuPont began to produce and sell polytetrafluoroethylene ("PTFE"). The production of PTFE requires PFOA as a processing aid, and results in the presence of PFOA in some PTFE products. DuPont marketed its PTFE under the trade name "Teflon." PTFE is a fluoropolymer (i.e., a plastic containing fluorine) used in a diverse range of applications, including as sprayable coating that resists heat, water, and oil; a lubricant; a coating for catheters and other medical equipment; and an oxidizer in flares—among many other uses.

73.    DuPont produced numerous other PFAS Products, and it marketed and sold PFAS Products throughout the United States, including in California and in the East Bay area.

74.    DuPont also began producing PFOA for its own use and for sale in the early 2000s, after 3M ceased PFOA production. DuPont continued to manufacture, market, and sell PFOA until at least 2013.

75.    The Defendants designed, manufactured, marketed, sold, and/or distributed large quantities of PFAS-containing and/or other PFAS Products in California, including in the East Bay area.

76.    All Defendants designed, developed, manufactured, marketed, sold, distributed, supplied, transported, handled, used, released, and/or disposed of PFAS Products in California in such a way as to cause harm to the State's natural resources, property, and citizens.

**D.    Defendants' Knowledge of Threats Posed by PFAS Products**

77.    For more than 50 years, Defendants were or should have been aware of the dangers posed to people by exposure to their PFAS Products (including via drinking water); and that the production and use of PFAS Products resulted in the release of PFAS to the environment. Despite

this knowledge, Defendants failed to adequately investigate and test their products to ensure they would not cause harm to the public; and continued their PFAS production and marketing practices without eliminating the defects in their products, and without warning of the known dangers of their products. These measures could have eliminated or reduced damage and injuries to Plaintiff's water supply.

78.     By 1956, PFAS from 3M's products were found to bind to proteins in human blood, resulting in bioaccumulation of those compounds in the human body.

79.     3M was informed as early as 1960 that chemical wastes from its PFAS manufacturing facilities that were dumped into landfills could leach into groundwater and otherwise enter the environment. An internal memo from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

80.     By at least the 1960s, 3M was aware that some PFAS do not naturally degrade in the environment. One 1963 report by 3M described PFAS as being stable in the environment, "completely resistant to biological attack," and "toxic."

81.     DuPont company scientists issued internal warnings about the toxicity associated with their PFOA products as early as 1961, including that PFOA caused adverse liver reactions in rats and dogs. DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

82.     As early as 1963, 3M was aware that its PFAS Products were stable in the environment and would not degrade after disposal.

83.     By the 1970s, 3M had become concerned about exposure to fluorochemicals in the general population.

84.     By at least 1970, 3M was aware that its PFAS Products were hazardous to marine life. One study of 3M fluorochemicals around this time had to be abandoned to avoid severe local pollution of nearby surface waters.

85.     In 1975, 3M found there was a "universal presence" of PFOA in blood serum samples taken from across the United States. Since PFOA is not naturally occurring, this finding reasonably should have alerted 3M to the likelihood that their products were a source of this

PFOA—a possibility that 3M considered internally but did not share outside the company. This finding also should have alerted 3M to the likelihood that PFOA is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the absorption of PFOA in blood from 3M's products.

86.     As early as 1976, 3M began monitoring the blood of its employees for PFAS because the company was concerned about PFAS's health effects.

87.     Other studies by 3M in 1978 showed that PFOA and PFOS are toxic to monkeys. In one study in 1978, all monkeys died within the first few days of being given food contaminated with PFOS. DuPont was aware of 3M's findings no later than 1981.

88.     Also in 1978, based on information it received from 3M about elevated and persistent fluoride levels in workers exposed to PFAS, DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers in order to assess whether any negative health effects could be attributed to PFOA exposure. This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of fluorine.

89.     In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota. A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and fluorochemicals bioaccumulating in fish tissue taken from the Tennessee River.

90.     According to a 3M environmental specialist who resigned his position due to the company's inaction over PFOS's environmental impacts, 3M had resisted calls from its own scientists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals. At the time of the specialist's resignation in 1999, that resistance had not ceased.

91.     In 1981, DuPont was informed that ingestion of PFOA caused birth defects in rats but continued manufacturing the chemical and failed to disclose the study results.

92.     In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."

93.     DuPont was long aware it was releasing PFAS from its facilities that were leaching into groundwater used for public drinking water. After obtaining data on these releases and the consequent contamination near DuPont facilities in West Virginia and Ohio, DuPont in 1984 held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting"). DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials capable of eliminating additional PFOA releases from its operations. DuPont chose not to use either, despite knowing of PFOA's toxicity.

94.     During the 1984 Meeting, DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They discussed DuPont's "incremental liability from this point on if we do nothing as we are already liable for the past 32 years of operation." They also stated that "legal and medical will likely take the position of total elimination" of PFOA use, and had "no incentive to take any other position."

95.     In 1984, 3M's internal analyses demonstrated that that fluorochemicals were likely bioaccumulating in 3M fluorochemical employees.

96.     By at least 1993, Defendants were aware that PFAS was linked to increased cancer rates in humans exposed to their PFOA products. 3M memos show that in 1993, it worked to change the wording in studies by a Dr. Gilliland, who around that time published a paper demonstrating a 3.3-fold increase in mortality rates for workers employed in jobs that exposed them to PFOA.

97.     Despite its understanding of the hazards associated with its PFAS Products, 3M actively sought to suppress scientific research on the hazards associated with those products, and mounted a campaign to control the scientific dialogue on the exposure, analysis, fate, effects, human health, and ecological risks of its PFAS Products. At least one scientist funded by 3M saw his goal as "keep[ing] 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

98.    3M's own ecotoxicologists continued raising concerns about PFAS until at least 1999.

99.    Despite decades of research, 3M first shared its concerns with the EPA in the late 1990s. In a May 1998 report submitted to EPA, "3M chose to report simply that PFOS had been found in the blood of animals, which is true but omits the most significant information" according to a former 3M employee.

100.    Indeed, 3M's own employees were highly critical of 3M's management of PFAS risks. In March 1999, for example, 3M environmental scientist Rich Purdy wrote to 3M and expressed his "profound disappointment" with "3M's handling of the environmental risks associated with the manufacture and use of" PFOS. Mr. Purdy described PFOS as "the most insidious pollutant since PCB," and that it is "probably more damaging than PCB because it does not degrade, whereas PCB does; it is more toxic to wildlife; and its sink in the environment appears to be biota and not soil and sediment, as is the case with PCB." Mr. Purdy described his attempts to discuss the dangers of the chemical with the company, and 3M's refusal to act. Finally, Mr. Purdy stated: "I can no longer participate in the process that 3M has established for the management of [PFAS.] For me it is unethical to be concerned with markets, legal defensibility and image over environmental safety."

101.    In response to pressure from the EPA, 3M began to phase out production of PFOS and PFOA products in 2000. On May 16, 2000, 3M issued a news release falsely asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production. On the same day as 3M's phase out announcement, an EPA internal email stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term." The author further stated that PFOS "appears to combine Persistence, Bioaccumulation, and Toxicity property to an extraordinary degree."

102.    Even after 3M ceased manufacturing PFAS, it worked to control and distort the science on PFAS and its dangers to the environment and human health. For example, 3M provided

millions of dollars in grants to a professor, John Giesy, who publicly presented himself as independent but behind the scenes worked for 3M. Mr. Giesy's goal, as expressed in a 2008 email, was to "keep 'bad' papers [regarding PFAS] out of the literature [because] otherwise in litigation situations they can be a large obstacle to refute." In fact, as recently as November 2018, 3M publicly stated that "the vast body of scientific evidence does not show that PFOS or PFOA cause adverse health effects in humans at current exposure levels, or even at the historically higher levels found in blood." And in 2019, 3M publicly claimed: "We do not believe that PFOS and PFOA cause harm to human health at levels that are typically found in the environment" and that "[w]e do not believe there is a public health issue related to PFOA and PFOS." These statements contradict decades of research demonstrating the serious health and environmental effects of PFAS, including internal studies conducted by 3M's own scientists.

103.    Similarly, DuPont has downplayed and distorted the science on PFAS. DuPont's own Epidemiology Review Board (ERB) repeatedly raised concerns about DuPont's practice of stating publicly that there were no adverse health effects associated with human exposure to PFOA. In June 2005, DuPont reported to the press that "no human health effects are known to be caused by PFOA." An ERB member called that statement "[s]omewhere between misleading and disingenuous." In February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of DuPont's public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

104.    Contrary to ERB's advice, DuPont's chief medical officer issued a press release in October 2006, stating that "there are no health effects known to be caused by PFOA." An ERB member criticized the press release because it "appear[ed] written to leave the impression 'don't worry.'"

105.    Defendants knew—or at the very least should have known—that the ordinary and intended use of their PFAS Products would injure the natural environment and threaten public health.

106. Defendants were all experts in the field of PFAS Products manufacturing and/or materials needed to manufacture PFAS Products.

107. By virtue of that expertise, Defendants all had detailed information and understanding about the chemical compounds that form PFAS Products.

108. As manufacturers and sellers of AFFF—or AFFF-related products, like telomer building blocks or PFAS-containing fluorosurfactants—, Defendants all had ready access to substantial information about PFAS.

109. This information was also accessible to all of Defendants as part of their ongoing involvement in various trade associations and groups formed for the purpose of defending their industry, products, and conduct.

110. One such group, the Firefighting Foam Coalition ("FFFC"), was formed in 2001 to dispel concerns the EPA had raised about AFFF's environmental viability. Many of the Defendants were members of the FFFC, including DuPont, Tyco, National Foam, Buckeye, and Kidde.

111. Through their involvement in the FFFC, as well as a variety of other trade associations and groups, Defendants shared knowledge and information regarding PFAS. They also worked together to protect AFFF and other PFAS Products from scrutiny and to shield the AFFF industry from the detrimental impact of the public and regulators learning about PFAS's harms to human health and the environment.

### E.    Major Sources of PFAS in East Bay Municipal Utility District's Water Supply and Wastewater Stream.

112. Manufacturing facilities where Defendants' PFAS Products are synthesized and made into products or chemical feedstocks, or where PFAS are used as processing aids, as well as secondary manufacturing facilities where PFAS Products such as PTFE are applied to other products, are major PFAS release sites. Industries that are known sources of PFAS releases to the environment include textile and leather processing, paper mills, metal finishers, wire manufacturers, plating facilities, manufacturers and facilities using fluorosurfactants, resins, molds, plastics, photolithography, and semiconductors. Commercial facilities such as automotive shops, print shops, and painting and coating facilities are also potential PFAS release sites. PFAS

releases at industrial and commercial sites are generally due to occur through air emissions and direct wastewater discharge, as well as accidental releases such as leaks or spills.

113.    Studies have shown that effluent from onsite wastewater treatment systems, drainage canals, stormwater conveyances, and septic systems are known sources of PFAS contamination to groundwater. The U.S. E.P.A has recognized that air emissions of PFAS from industrial sources are a significant route for PFAS releases to the environment. Such releases are likely to have contributed to the release of PFAS from Defendants' PFAS Products, and consequent contamination of Plaintiff's reservoirs.

114.    Landfills receive industrial waste, sewage sludge, waste from site mitigation, and PFAS-bearing consumer goods. PFAS in landfills and former landfills can leach from these wastes into ground and surface water. PFAS may also be released from landfills in fugitive dust or directly to the atmosphere. Landfills constructed before 1990 that received industrial and construction waste deposits have a higher potential for contributing to PFAS releases because they were not required to be constructed with flexible membrane liners or other leachate control measures. Nationwide studies in the United States, as well as Canada and Europe, have shown high levels of PFAS in landfill leachate. Such releases are likely to have contributed to the release of PFAS from Defendants' PFAS Products, and consequent contamination of Plaintiff's reservoirs. *See* supra ¶ 48.

115.    Municipal and industrial wastewater treatment plants are also repositories and conduits for industrial and consumer items containing PFAS. Many of these facilities, including EBMUD's, receive and treat leachate from landfills. Standard wastewater treatment technology and processes do not treat for or remove PFAS. PFAS compounds are then present in the waste received by businesses, residents, and commercial or industrial enterprises, including in leachate.

116.    These industrial and personal uses and the biproducts of waste result in PFAS passing through the wastewater treatment process, and are ultimately discharged in the effluent and biosolid residuals. Thus, from the use and disposal of PFAS in industrial processes to the use and disposal of consumer goods, resulting PFAS disposal, distribution, and contamination occurs at simultaneous macro and micro levels. Plaintiff may be required to take additional treatment

COMPLAINT                                                                 26

steps to meet future regulations regarding its discharged effluent, recycled water, and biosolids, which will come at a significant cost to EBMUD.

**F.     East Bay Municipal Utility District Is Injured**

117.     PFAS have been detected in varying amounts at varying times in Plaintiff's reservoirs and wastewater streams, including at levels that will compel Plaintiff to take responsive actions. In addition, PFAS's high mobility and persistence in groundwater and surface water means they will likely continue to spread and impact more of Plaintiff's water resources in the future.

118.     Defendants' PFAS Products are the substantial sources of the PFAS released to the environment that ultimately reached the surface water that supplies Plaintiff's reservoirs and distribution system, as well as the wastewater that is treated by EBMUD. PFAS have reached Plaintiff's distribution system due to the routine, foreseeable, and intended use and disposal of Defendants' PFAS Products in the vicinity of locations from which Plaintiff obtains water, including its reservoirs and groundwater resources. Such use, disposal, and environmental transport has brought PFAS to Plaintiff's reservoirs from releases at a myriad of diffuse sources such as industrial and manufacturing facilities and businesses; sites where consumer products are disposed; AFFF releases in the Bay area and near Plaintiff's reservoirs; and others.

119.     To address PFAS contamination in its reservoirs, Plaintiff has, inter alia, incurred expenses in investigating, monitoring, and will likely be required to develop plans to address PFAS in its reservoirs, including by increasing sampling frequency and potentially adding surface water treatment. Plaintiff anticipates taking these and additional steps to address the continuing and future PFAS contamination in its reservoirs and groundwater resources attributable to Defendants' tortious conduct.

120.     The most viable technologies to remove PFAS compounds from drinking water are granular activated carbon treatment ("GAC"), reverse osmosis, electrochemical oxidation, and anion exchange. Each of these technologies is extremely expensive to build, install, operate, and maintain. And, disposal of spent resin relating to these treatments is presently expensive and is expected to increase in expense.

121.    Treatment for PFAS in wastewater is more complex than treatment in drinking water; standard wastewater treatment technology and processes do not currently treat for or remove PFAS. Furthermore, biological constituents and other contaminants found in waste streams can hinder the effectiveness of PFAS treatment technologies like GAC.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Strict Products Liability for Defective Design
### (Against All Defendants)

122.    Plaintiff realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

123.    As commercial designers, manufacturers, distributors, suppliers, sellers, and/or marketers of PFAS Products, Defendants had a strict duty not to place into the stream of commerce a product that is unreasonably dangerous.

124.    Defendants knew that third parties would purchase their PFAS Products and use them without inspection for defects.

125.    PFAS Products purchased or otherwise acquired (directly or indirectly) from Defendants by third parties were applied, discharged, disposed of, or otherwise released onto lands and/or water in the vicinity of Plaintiff's drinking water reservoirs and groundwater resources and in such a way that PFAS are detected in Plaintiff's wastewater effluent. Such discharges occurred at various locations, at various times, and in various amounts.

126.    Defendants' PFAS Products purchased by third parties were used and disposed of in a reasonably foreseeable manner and without substantial change in the condition of such products.

127.    Defendants knew or reasonably should have known that the use of their PFAS Products in their intended manner would result in the spillage, discharge, disposal, or release of PFAS onto land or into water.

128.    The PFAS Products used and/or disposed of in the community served by EBMUD and in the vicinity of Plaintiff's reservoirs and groundwater resources were defective in design and unreasonably dangerous because, among other things:

    a.  PFAS causes extensive and persistent surface water contamination when they, or products containing or degrading to them, are used in their foreseeable and intended manner.

    b.  PFAS contamination in drinking water poses significant threats to public health and welfare.

    c.  PFAS Products enter the wastewater where they are transformed or partitioned and cannot be easily destroyed, creating a significant threat to public health and the environment.

    d.  Defendants failed to conduct and/or failed to disclose reasonable, appropriate, or adequate scientific studies to evaluate the environmental fate and transport and potential human health effects of PFAS.

129.    At all times relevant to this action, Defendants' PFAS Products were dangerous to an extent beyond that which would be contemplated by the ordinary consumer, and/or the foreseeable risk of harm to public health and welfare posed by PFAS outweighed the cost to Defendants of reducing or eliminating such risk.

130.    Defendants knew or should have known about feasible alternatives to their PFAS Products without the use of PFAS, and the omission of such alternative designs rendered Defendants' products not reasonably safe.

131.    As a direct and proximate result of the defects previously described, several of Plaintiff's reservoirs and groundwater resources have been, and continue to be, contaminated with PFAS in varying amounts over time, causing Plaintiff's significant injury and damage.

132.    As a direct and proximate result of the Defendants' acts and omissions as alleged herein, Plaintiff have incurred, is incurring, and will continue to incur damages related to PFAS contamination of its reservoirs, groundwater resources, and wastewater effluent in an amount to be proved at trial.

133.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of drinking water supply. Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS Products, in conscious disregard of the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

134.    Defendants are strictly, jointly, and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

**SECOND CAUSE OF ACTION**
**Strict Products Liability for Failure to Warn**
**(Against All Defendants)**

135.    Plaintiff realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

136.    As designers, manufacturers, distributors, sellers, suppliers, and/or marketers of PFAS Products, Defendants had a strict duty to warn against latent dangers resulting from foreseeable uses of their products that Defendants knew or should have known about.

137.    Defendants knew that third parties would purchase PFAS Products and use them without inspection for defects.

138.    PFAS Products purchased or otherwise acquired (directly or indirectly) from Defendants by third parties were applied, discharged, disposed of, or otherwise released at various locations, at various times, and in various amounts onto the lands and/or water in the vicinity of Plaintiff's reservoirs and in discharges to Plaintiff's wastewater treatment plant, resulting in PFAS in Plaintiff's effluent and biosolids.

139.    The PFAS Products purchased by third parties were used in a reasonably foreseeable manner and without substantial change in the condition of such products.

140. Defendants knew or should have known that the use of PFAS Products in their intended manner would result in the discharge, disposal, or release of PFAS onto land or into water.

141. The PFAS Products used in the vicinity of Plaintiff's service area were defective in design and unreasonably dangerous products for the reasons set forth above.

142. Despite the known and/or reasonably foreseeable hazards to human health and welfare associated with the use of PFAS Products in the vicinity of Plaintiff's reservoirs, including contamination of public drinking water supplies with PFAS, Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

143. In particular, Defendants failed to describe such hazards or provide adequate precautionary statements regarding such hazards in the labeling of their PFAS Products or otherwise.

144. As a direct and proximate result of Defendants' failure to warn of the hazards posed by disposal or release of PFAS Products in the vicinity of public drinking water reservoirs that were, or reasonably should have been, known to them, PFAS contaminate Plaintiff's reservoirs and groundwater resources in varying amounts and continue to be detected in Plaintiff's wastewater discharges.

145. As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFAS contamination of its reservoirs, groundwater resources, and wastewater effluent in an amount to be proved at trial.

146. Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of drinking water reservoirs and groundwater resources. Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS Products, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore,

Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

147. Defendants are strictly, jointly, and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

### THIRD CAUSE OF ACTION
### Negligence
### (Against All Defendants)

148. Plaintiff realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

149. As commercial manufacturers, sellers, distributors, suppliers, marketers, and/or designers of PFAS Products, Defendants owed a duty of care to Plaintiff and to third-party end users not to place into the stream of commerce products that were in a defective condition and unreasonably dangerous to drinking water and wastewater effluent in Plaintiff's service area.

150. Defendants breached this duty by negligently designing, formulating, manufacturing, distributing, selling, supplying, and/or marketing such unreasonably dangerous PFAS Products into the stream of commerce, including in the Plaintiff's service area, even when they knew or should have known about the dangers PFAS posed to drinking water reservoirs, groundwater resources, and to wastewater effluent.

151. As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFAS contamination of its reservoirs and groundwater resources in an amount to be proved at trial.

152. Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of drinking water reservoirs. Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS Products, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests

an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

153.    Defendants are jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

**FOURTH CAUSE OF ACTION**
**Public Nuisance**
**(Against All Defendants)**

154.    Plaintiff realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

155.    Plaintiff provides drinking water from its reservoirs to residents and businesses for drinking, bathing, cleaning, washing, and other uses.

156.    Plaintiff also treats water used by residents and businesses and discharges it once treated.

157.    Defendants' acts and omissions, including their manufacture, promotion, marketing, sale, distribution, supply, defective design of, and/or failure to warn regarding PFAS in their products, contaminated Plaintiff's reservoirs, groundwater resources, and wastewater effluent.

158.    Consequently, Defendants substantially interfered with and caused damage to a public or common resource that endangered public property, as well as the health, safety, and comfort of a considerable number of persons. Such action creates, contributes to, or maintains a public nuisance.

159.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFAS contamination of its reservoirs, groundwater resources, and wastewater effluent in an amount to be proved at trial.

160.    As an owner of reservoirs and purveyor of drinking water, Plaintiff suffers injuries different in kind from the community at large because it relies significantly upon its reservoirs for its public service functions.

161.     Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of drinking water reservoirs and groundwater resources. The Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS Products, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

162.     Defendants are jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

**FIFTH CAUSE OF ACTION**
**Trespass**
**(Against All Defendants)**

163.     Plaintiff realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

164.     Plaintiff owns and possesses its drinking water production system, including drinking water production reservoirs and aqueducts that carry and store surface water in Plaintiff's service area.

165.     Plaintiff actually and actively exercises its rights to appropriate and use surface water stored in its reservoirs.

166.     Plaintiff also owns and operates a wastewater treatment system through which it treats and discharges wastewater effluent.

167.     Plaintiff did not give any Defendant permission to cause PFAS to enter its reservoirs, groundwater resources, or its wastewater effluent.

168.     Defendants knew or reasonably should have known that PFAS have a propensity to infiltrate reservoirs when used as intended; are mobile and persistent contaminants capable of moving substantial distances in the air, water, and soil; are toxic to human health; and are therefore hazardous to drinking water systems and human health.

169.    Defendants manufactured, promoted, marketed, distributed, and/or sold PFAS Products, which Defendants knew or reasonably should have known would virtually certainly be discharged and release toxic PFAS into the ground, septic, sewer system, and surface water, and intrude upon, contaminate, and damage Plaintiff's possessory interest.

170.    Defendants' conduct constitutes a continuing unauthorized intrusion and a continuing trespass onto Plaintiff's property.

171.    Each Defendant is a substantial factor in bringing about the contamination of Plaintiff's reservoirs, and each Defendant aided and abetted the trespasses and is jointly responsible for the injuries and damage caused to Plaintiff.

172.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFAS contamination of its reservoirs and wastewater effluent in an amount to be proved at trial.

173.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of drinking water reservoirs. Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS Products, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

174.    Defendants are jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

**SIXTH CAUSE OF ACTION**
**Declaratory Relief**
**(Against All Defendants)**

175.    Plaintiff realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

176.    Defendants knew, or should have known, that their PFAS Products, when used in

a foreseeable and intended manner, was dangerous and created an unreasonable and excessive risk of harm to human health and the environment.

177. Defendants intentionally, willfully, deliberately and/or negligently failed to properly warn, train, handle, control, dispose, and release noxious and hazardous contaminants and pollutants, such that Defendants created substantial and unreasonable threats to human health and the environment, which resulted from the foreseeable and intended use, disposal, and storage of PFAS and PFAS Products.

178. Among other things, Plaintiff is likely to be required to take costly remedial action to remove PFAS contamination which will result in substantial costs, expenses, and damages in an amount to be proved at trial.

179. These Defendants, and each of them, have failed to reimburse Plaintiff for the cost of investigation, remediation, cleanup, and disposal costs and/or deny any responsibility or liability for these damages and expenses Plaintiff will incur in the future.

180. An actual controversy exists concerning who is financially responsible for abating actual or threatened pollution or contamination of Plaintiff's water resources and wastewater effluent by PFAS.

181. In order to resolve this controversy, Plaintiff seeks an adjudication of the respective rights and obligations of the parties, and other relief to the extent necessary to provide full relief.

## VI. PRAYER FOR RELIEF

182. Plaintiff East Bay Municipal Utility Water District prays for judgment against Defendants, jointly and severally, awarding Plaintiff:

    a.  Compensatory damages in an amount according to proof;

    b.  Punitive damages in an amount to be determined at trial;

    c.  Injunctive and equitable relief, including in the form of a fund to abate the nuisance and trespass;

    d.  Equitable relief, including indemnification, restitution, and/or disgorgement in an amount to be determined at trial;

e.  All appropriate declaratory relief;

f.  Plaintiff's costs in prosecuting this action, including reasonable attorneys' fees, court costs, expert fees, and other expenses of litigation;

g.  Pre-judgment interest and post-judgment interest; and

h.  All other relief this Court deems just, proper, and equitable.

Dated:  February 17, 2023                    Respectfully submitted,

                                             **SHER EDLING LLP**

                                             By:  _/S/ Matthew K. Edling_____

                                             VICTOR M. SHER (SBN 96197)
                                             MATTHEW K. EDLING (SBN 250940)
                                             STEPHANIE D. BIEHL (SBN 306777)
                                             ASHLEY B. CAMPBELL (*PHV forthcoming*)
                                             100 Montgomery St. Ste. 1410
                                             San Francisco, CA 94104
                                             Tel.: (628) 231-2500
                                             vic@sheredling.com
                                             matt@sheredling.com
                                             stephanie@sheredling.com
                                             ashley@sheredling.com

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff requests a trial by jury of all claims asserted in this Complaint.

Dated: February 17, 2023                    Respectfully submitted,

                                                     **SHER EDLING LLP**

                                                     By: _/S/ Matthew K. Edling_____

VICTOR M. SHER (SBN 96197)
MATTHEW K. EDLING (SBN 250940)
STEPHANIE D. BIEHL (SBN 306777)
ASHLEY B. CAMPBELL (*PHV forthcoming*)
100 Montgomery St. Ste. 1410
San Francisco, CA 94104
Tel.: (628) 231-2500
vic@sheredling.com
matt@sheredling.com
stephanie@sheredling.com
ashley@sheredling.com